# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

WALTER ROY MARTIN,

Plaintiff,

v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

Defendant.

______________________________________/

**Case No. 1:12-cv-01220-LJO-SKO**

**FINDINGS AND RECOMMENDATIONS THAT THE ALJ'S DECISION BE AFFIRMED AND JUDGMENT BE ENTERED FOR DEFENDANT**

**OBJECTIONS DUE: 14 DAYS**

## INTRODUCTION

Plaintiff Walter Roy Martin ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his application for Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act (the "Act"). 42 U.S.C. § 405(g). The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.

For the reasons set forth below, the undersigned RECOMMENDS that the ALJ's decision be AFFIRMED and that judgment be entered for Defendant Carolyn W. Colvin, Acting Commissioner of Social Security.

## BACKGROUND

Plaintiff was born in 1956 and was 48 years old at the time of his alleged date of disability onset. (AR 101.) Plaintiff last met the insured requirements of the Act on December 31, 2007, the oldest age at which he may be evaluated in connection with his disability claim. Plaintiff graduated from high school, and completed two years of college. (AR 137.) Plaintiff is approximately 6 feet, 2 inches tall and weighs 311 pounds. Prior to gastric bypass surgery, Plaintiff weighed 450 pounds. (AR 616.) Between 1988 and 1998 and again from 2001 to 2003, Plaintiff worked in construction. (AR 113.) From November 1998 to November 2001, he worked as a caregiver. (AR 113.) Plaintiff stopped working due to pain in both his shoulders and in his mid-back near his shoulder blades. (AR 616.) Plaintiff alleges he became disabled on March 29, 2003, due to cervical spine impairment, a stroke, and arthritis. (AR 132.)

### A. Relevant Medical Evidence

Plaintiff underwent gastric bypass surgery in March 2000. (AR 268.) On November 29, 2003, Plaintiff was admitted to the emergency room with right-sided weakness of both of his upper and lower extremities, a near-syncopal[1] episode, residual right hand numbness, and an inability to walk or stand. (AR 313-14.) Plaintiff reported he was moving furniture when he fell for an unknown reason. (AR 319.) The treatment notes indicate Plaintiff likely had a "transient ischemic attack" ("TIA"), and he was recommended for four to six weeks of physical and occupational therapy.[2] (AR 314.) He was discharged on December 2, 2003. (AR 316.)

On March 2, 2004, a head computed tomography ("CT") scan was ordered due to dizziness and a history of TIA, but the scan showed no evidence of an acute intracranial event. (AR 287.) Also by March 2004, Plaintiff had lost 212 pounds and he had developed a ventral hernia in the epigastric wound shortly after his gastric bypass surgery, which required surgical repair on March 11, 2004. He underwent a second ventral hernia repair on April 7, 2004. (AR 259-61.)

---

[1] Syncope refers to a temporary suspension of consciousness due to generalized cerebral ischemia. *Dorland's Illustrated Medical Dictionary* 1845 (31st ed. 2007).

[2] The Mayo Clinic describes a transient ischemic attack as "like a stroke, producing similar symptoms, but usually lasting only a few minutes and causing no permanent damage." *See http://www.mayoclinic.org/diseases-conditions/transient-ischemic-attack/basics/definition/con-20021291*.

On June 22, 2004, Plaintiff reported hand and leg pain for the prior four months as well as cramping and numbness in his right hand. (AR 247.) Plaintiff was treated again on February 18, 2005, and he reported head, leg, and arm pain. (AR 203.) A magnetic resonance imaging ("MRI") of Plaintiff's cervical spine was ordered. (AR 485-86.) The radiologist reported the following findings:

> Degenerative and acquired and congenital changes of the cervical spine with subsequent severe central spinal stenosis seen at the C4-5 level and moderate central spinal stenosis at the C5-6 and C3-4 levels. Marked bilateral neural foraminal narrowing at the C5-6 level is identified, as well as moderate bilateral neural foraminal narrowing at the C4-5 and C5-6 levels. In addition, mild central spinal stenosis at the C6-7 level is seen.

(AR 486.)

In May 2005, Plaintiff fell on his left arm, which exacerbated his arm pain. (AR 378.) In June 2005, Plaintiff reported pain in his right shoulder and examination revealed mild tenderness on palpation. (AR 372.) On July 18, 2005, Plaintiff was seen for right-sided weakness and reported that both his hands were constantly numb. (AR 384.) On September 23, 2005, Plaintiff reported neck pain over the previous five months, with pain radiating into both upper extremities over the three to four weeks prior to examination. (AR 371.) It was noted that his right shoulder mobility was deceased, and he was unable to abduct the shoulder more than 60 degrees. (AR 371.)

Plaintiff underwent an MRI of his cervical spine on October 18, 2005; the radiologist provided the following impression:

> 1. At the C4-5 level there is a right posterolateral disc protrusion measuring 3.5 mm in AP dimension which indents the cervical cord resulting in moderate to severe central stenosis. There is also right neural foraminal stenosis at this level.
> 2. No cord edema is identified at this time.
> 3. At the C5-6 level there is left posterior osteophyte resulting in left neural foraminal stenosis.

(AR 481-82.) An MRI of Plaintiff's right shoulder was also obtained on October 18, 2005, which showed degenerative changes involving the acromiclavicular ("AC") joint resulting in tendonosis. (AR 483.) On November 14, 2005, x-rays indicated right AC joint arthritis with impingement.

(AR 368.) December 15, 2005, treating records indicate Plaintiff was seen for shoulder, neck, and leg pain that had worsened in the prior two months and was associated with numbness in both arms. (AR 363.) The treating notes also indicate Plaintiff was "being seen by neurosurgery and has been recommended surgery for the stenosis." (AR 363.)

Plaintiff again sought treatment on February 15, 2006, for shoulder pain and popping. (AR 357.) It was noted Plaintiff's cervical stenosis was confirmed by MRI and that "orth service planned to perform surgery," but Plaintiff needed to quit smoking before surgery. (AR 357.) March 3, 2006, x-rays of Plaintiff's shoulders showed mild bilateral AC joint degenerative changes. (AR 352.) On June 19, 2006, Plaintiff was admitted to the emergency room with complaints of cramping in his arms. (AR 333.) Plaintiff reported that the pain started when he was working in the heat and picked up a wheelbarrow. (AR 333.) He was prescribed Vicodin. (AR 333.) In July 2006, Plaintiff again presented for examination with complaints of right shoulder and neck pain, and Vicodin and Neurotin were prescribed. (AR 328, 426.)

On December 1, 2006, Plaintiff was examined by Rustom F. Damania, M.D. (AR 509-14.) Plaintiff's chief complaints included chronic neck pain since 2003; pain in his right knee which swells and gives way; right shoulder pain since 2003; and a stroke in 2003, which he believes causes him paresthesias in both hands and feet and weakness in his right arm and left leg. (AR 509.) Dr. Damania reviewed a 2005 MRI of Plaintiff's cervical spine showing right posterior lateral disc protrusion resulting in moderate to severe central stenosis. (AR 509.) The MRI also showed right neural foraminal stenosis; at C5-6, there was a left posterior osteophyte resulting in left neural foraminal stenosis. (AR 509.)

Dr. Damania noted Plaintiff had undergone gastric bypass surgery; Plaintiff weighed 520 pounds at the time of the surgery, and weighed 311 pounds at the time of examination. (AR 510.) He indicated Plaintiff smoked half a pack of cigarettes per day. (AR 510.) On examination, Plaintiff's coordination was noted to be slightly impaired due to weakness in the right arm and leg, but Dr. Damania was unsure if complete effort was given by Plaintiff. Plaintiff reported that he uses a cane, but he left it at home. A subtle limp was observed on Plaintiff's right side, but his station and posture were otherwise normal. (AR 511.) A Romberg test was negative, and a

straight leg raise test was normal. (AR 511, 512.)

Dr. Damania observed that Plaintiff's right knee was swollen and "a little tender"; his right shoulder joint was tender and occasional crepitations were palpable; he had a decreased range of motion, but no signs of ankylosis, deformity, or subluxations. (AR 512.) His motor strength was 4/5 in the right extremities and 5/5 on the left side. (AR 513.) There was no evidence of spasms or atrophy of the muscles, and no tremors. (AR 513.) Dr. Damania diagnosed obesity, suspicion of osteoarthritis in the right knee; suspicion of either bursitis or mild osteoarthritis of the right shoulder; a vitamin B-12 deficiency secondary to gastric bypass surgery; and cervical spondylosis but no clinical evidence of radiculopathy. (AR 513.)

Functionally, Dr. Damania opined that Plaintiff should be able to lift and carry 20 pounds occasionally and 10 pounds frequently. If medical records verified Plaintiff had suffered a stroke, lifting on the right side would be restricted to 10 pounds occasionally and less than 10 pounds frequently.[3] He also opined that Plaintiff would be able to stand and walk for two hours in a normal eight-hour day with normal breaks, and would be able to sit for six hours. Although Plaintiff indicated he used a cane, Dr. Damania noted there was no indication from radiology reports that Plaintiff required an assistive device for ambulation. An x-ray of Plaintiff's right knee was needed to determine the severity of his osteoarthritis. The x-rays Dr. Damania reviewed were "essentially normal" with the exception of the x-rays of the cervical spine. Dr. Damania opined that Plaintiff had no postural limitations, but frequent and rapid movement of his neck would be impaired. (AR 514.) He found that there was no objective evidence for manipulative limitations. While Plaintiff stated that he had pain in his shoulders and could not perform a range of motion, Dr. Damania indicated this should be confirmed by MRI. If there were a right shoulder rotator cuff injury, Plaintiff would have impairment lifting above shoulder level on the right. (AR 514.) He also found there were environmental limitations to balancing and climbing. (AR 514.)

On January 23, 2007, Plaintiff again reported right shoulder and neck pain on examination, which was attributed to his cervical stenosis and traction was recommended. (AR 183.)

[3] Dr. Damania's examination notes do not indicate that Plaintiff's November/December 2003 treating records were available for his review. The November 29, 2003, records indicate that Plaintiff suffered a TIA.

On February 8, 2007, Ernest Wong, M.D., a state agency non-examining physician, reviewed Plaintiff's medical records. (AR 501-08.) He opined Plaintiff could occasionally lift and/or carry 20 pounds, and frequently lift and/or carry 10 pounds; stand or walk with normal breaks for a total of about six hours in an eight-hour day; sit with normal breaks for a total of about six hours in an eight-hour workday; and push or pull with the same limitation as described for lifting and carrying. (AR 502.) He found Plaintiff was restricted to only occasional balancing, kneeling, crouching, or crawling; Plaintiff was limited in his ability to reach in all directions. (AR 504.) Dr. Wong disagreed with Dr. Damania's opinion that Plaintiff could only walk for two hours in an eight-hour workday and that he was limited in his right upper extremity to carrying no more than 10 pounds occasionally, and less than 10 pounds frequently. (AR 506.) Dr. Wong found these limitations unsupported by the examination findings which were limited to a subtle antalgic gait and a 4/5 right lower extremity strength test. (AR 506.)

On August 17, 2007, treatment notes show that surgery for Plaintiff's cervical stenosis was deemed contraindicated because Plaintiff had not quit smoking. (AR 167.) On September 14, 2007, an MRI of Plaintiff's right knee showed, among other things, a degenerative tear of the posterior horn and body of the medial meniscus, findings consistent with medial collateral ligament ("MCL") sprain/partial tearing, probable chronic anterior cruciate ligament ("ACL") sprain. (AR 463-64.)

September 28, 2007, treating notes indicate that a physician found Plaintiff temporarily disabled. (AR 164.) The physician assessed Plaintiff with morbid obesity, cervical disc disease, and right shoulder and knee pain. (AR 164.)

On October 23, 2007, Plaintiff appeared for physical therapy; an initial evaluation and treatment plan was formulated. (AR 436.) The stated goals included decreased neck and right upper extremity pain to enable Plaintiff to sleep with decreased interruptions by pain; increased cervical range of motion and right upper extremity strength to enable Plaintiff to dress and perform activities of daily living with increased ease; demonstrate effective self-management techniques for cervical spine and postural dysfunction; and to be independent in a home exercise program and understand proper body mechanics. (AR 436.) He was recommended for therapy

two times per week for four weeks. (AR 436.)

On November 12, 2007, a physical therapy discharge summary indicates Plaintiff failed to attend any of his follow-up appointments but one, and therefore he was discharged from physical therapy due to nonattendance. (AR 433.)

On March 31, 2008, Maryam Kermani, M.D., completed a form assessing Plaintiff's physical condition. (AR 493-98.) She stated she had been treating Plaintiff since 2001, and had most recently examined Plaintiff on March 17, 2008. (AR 493.) She diagnosed Plaintiff with degenerative disc disease, spinal stenosis C5-6, and MCL sprain/partial tearing. (AR 493.) Dr. Kermani noted reduced grip strength and tenderness in both of Plaintiff's upper extremities. (AR 494.) She also indicated that Plaintiff had knee, shoulder, and arm pain along with neuropathy. (AR 494.) Plaintiff's symptomatology included decreased range of motion, pain, and numbness in his hands and lower extremities. (AR 494.) Dr. Kermani opined Plaintiff should never lift more than 5 pounds, and only occasionally lift less than five pounds; and Plaintiff should never carry any weight. (AR 495.) Dr. Kermani checked boxes indicating Plaintiff's condition interferes with his ability to keep his neck in a constant position, and Plaintiff is unable to do a full time competitive job that requires that activity on a sustained basis; Plaintiff's symptomatology and pain would increase if he had to perform significant repetitive reaching, handling, or fingering; Plaintiff's impairments were expected to last longer than 12 months; and no emotional factors contribute to the severity of Plaintiff's symptoms or functionality. (AR 496.) Dr. Kermani also indicated that Plaintiff would have marked limitations in activities including grasping, turning twisting objects; using his fingers and hands for fine manipulations; and using his arms for reaching, including overhead. (AR 497.)

**B. Administrative Proceedings**

The Commissioner denied Plaintiff's application initially and again on reconsideration; consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 60-65, 67-71.) On February 7, 2008, the ALJ held a hearing. Plaintiff testified, through the assistance of counsel, and a Vocational Expert ("VE") testified. (AR 608-39.)

**1. Administrative Hearing on February 7, 2008**

Plaintiff testified that he suffers from constant pain in both his shoulders as well as in his upper back. (AR 616.) His arms, fingers, and hands remain numb all the time and he has a problem handling small objects as a result. (AR 617.) He also has difficulty writing because his hands cramp after a few sentences, and he will have to wait until they stop cramping before he can resume writing. (AR 618-19.) The hand cramping also makes picking up larger items difficult. (AR 620.) Different physicians have told him that he should not lift more than 20 pounds. (AR 621.) His physical problems started in 2003, and have been getting worse since that time. (AR 618.) He takes medication for his pain, which eases the pain but does not preclude it. (AR 622.) The medication makes him groggy throughout the day.

**2. ALJ's Decision**

On June 20, 2008, the ALJ issued a decision finding Plaintiff not disabled at any time from November 20, 2003, through December 31, 2007, the last date of insured status for purposes of DIB. (AR 15-23.)

**3. District Court Remand**

Plaintiff appealed the ALJ's decision. Based upon the agreement of the parties, the District Court ordered the case be remanded to the agency to further develop the record and determine Plaintiff's residual functional capacity on his date of last insured, December 31, 2007. (AR 669-70.)

**4. Appeals Council Remand**

Pursuant to the District Court's remand order, the Appeals Council vacated the ALJ's decision and remanded the case for further proceedings consistent with the Court's order. (AR 667-68.) While the ALJ had given weight to Dr. Wong's opinion, rendered on February 8, 2007, further medical evidence was received after his opinion was provided. (AR 667.) An MRI of Plaintiff's right knee was performed on September 14, 2007, which showed a complex/degenerative tear of the posterior horn and body of Plaintiff's lateral meniscus, as well as

a probable ACL sprain.[4] (AR 667.) Additionally, Plaintiff was examined on September 28, 2007, by a physician who opined that Plaintiff was temporarily disabled because of obesity and his right shoulder and right knee impairments. The Appeals Council noted it was possible that, had Dr. Wong reviewed this evidence, he might have come to a different conclusion regarding Plaintiff's residual functional capacity. (AR 667.) On remand, the ALJ was to obtain evidence from a medical expert to assist in assessing Plaintiff's limitations through December 31, 2007, the last day on which he was eligible for entitlement to disability insurance benefits. (AR 668.)

**2. Administrative Hearing on November 8, 2010**

**a. Plaintiff's Hearing Testimony**

Plaintiff testified through the assistance of counsel. (AR 737-59.) Plaintiff continues to have problems with his shoulders, which worsen when there is moisture in the air. (AR 746.) For example, Plaintiff cannot raise his left arm up over his head. (AR 746-47.) He also has problems with his right arm at times, including swelling and he suffers "continuous pain all the time." (AR 747.) He also suffers from numbness in his hands which feel "prickly all the time," and he "get[s] cramps and stuff." (AR 474.)

Plaintiff's weight has fluctuated since 2008. (AR 474.) He had gastric bypass surgery when he was approximately 400 pounds because at that weight he was unable to walk much. (AR 748.) He lost weight following the surgery, but then he lost weight too rapidly and his weight started to fluctuate. (AR 748.) His right leg is a problem as well because when he is walking it will "just go out" with no warning. (AR 748.) The leg pops, creaks, and aches all the time and when he attempts to walk, he will have to sit down and rest. He can stand for approximately an hour to an hour and a half. (AR 749.) Sitting is the most comfortable position, but he still has pain in his legs, ankles, and knees. (AR 749.) The pain in his legs is continuous, whether he is seated or not. (AR 749.)

Writing is also a problem for Plaintiff's hands, and anything small he has to manipulate with his hands is difficult and causes cramping. (AR 750.) Plaintiff disagrees with Dr. Jensen's

---

[4] The Appeals Council's order references a September 7, 2007, MRI of Plaintiff's right knee, but the MRI report is dated September 14, 2007. (*See* AR 463.)

opinion that he can walk or stand a total of six hours in an eight-hour day. (AR 750.) Plaintiff testified that he could not stand for six hours due to the pain in his legs. (AR 750.) Plaintiff has been having these problems since 2003, and has been treated at Community Clinic, but he is rarely able to see an actual physician, as opposed to other treating professionals on staff. (AR 751.) He is unable to perform his past work because it was heavy manual labor. (AR 751.) He retains the ability to lift approximately 15 to 20 pounds continuously; for example, he can take bags of groceries out of the basket and bring them into the house. (AR 753.) However, when he tries to pick up things requiring the use of his hands, including writing, it causes pain in various places in his hand. (AR 753.) He can write continuously for about five minutes, but then he has to rest, and perhaps he can then write more. (AR 754.) He takes pain medication, but it never alleviates all the pain, it just makes the pain more tolerable. (AR 752.) The medication also makes him groggy for about 45 minutes to an hour, and then it is better.

**b. Medical Expert Hearing Testimony**

Joseph Jensen, M.D., a physician who is Board certified in orthopedics, appeared at the hearing and provided testimony. The ALJ asked Dr. Jensen whether the later documents received would have changed Dr. Wong's opinion had he had access to that information. (AR 742.) Dr. Jensen testified that, despite that the latest MRI disclosed some evidence of right knee internal derangement – specifically tears of the menisci as well as evidence of an old medial collateral ligament injury – there were no objective physical findings to indicate significant problems such as lack of stability or lack of motion. (AR 742.) Based on this MRI evidence, Dr. Jensen felt Dr. Wong's opinion should be altered to indicate that Plaintiff could maintain up to six hours of combined standing and walking, but Plaintiff could only occasionally perform right-knee kneeling. (AR 742.)

Plaintiff's counsel also questioned Dr. Jensen. (AR 743.) Dr. Jensen testified that he had reviewed Plaintiff's medical records, and there was medical evidence demonstrating that Plaintiff appeared to be suffering "some significant cervical spine spondylosis," which was not addressed by Dr. Wong. (AR 743.) Dr. Jensen testified that he had reviewed a cervical spine MRI dated February 25, 2005, that showed "about a 3.5 disc herniation, then some moderately severe central

stenosis, more on the right side," as well as some neuroforaminal narrowing at the C4-5 level. (AR 744.) Dr. Jensen noted that, throughout 2007, there were several occasions when Plaintiff was seen by a neurosurgeon and that there was consideration being given for addressing this disc level with surgery, but the surgery required Plaintiff to quit smoking, which he had not done, and thus the surgery could not be performed. (AR 744.) While Plaintiff's weight would be a concern for surgery, smoking, and not Plaintiff's weight, was the reason the surgery was delayed. (AR 745.) Further, although the MRIs and examination records supported a diagnosis of degenerative disc disease and spinal stenosis, Dr. Jensen did not agree with the extent of the limitations opined by Dr. Kermani. (AR 745.)

**c. VE Testimony**

A VE testified at the hearing. (AR 754-57.) The ALJ asked the VE to consider a hypothetical person of Plaintiff's age, education, and work experience who could perform light physical exertional work, but subject to the following limitations: he can only occasionally push or pull with the right upper extremity and with the right lower extremity; occasionally kneel, crouch, crawl, or climb ladders, ropes or scaffolds; occasionally work overhead; and occasionally handle, finger, and feel with both hands. (AR 755.) The VE testified that such a hypothetical person would be able to perform work as a bakery worker. There would be 157 jobs available in California, and approximately nine times that many in the United States. This hypothetical individual would also be able to perform work as an usher; there are 2,162 jobs available in California, and nine times that number in the United States. (AR 756.)

Plaintiff's counsel also posed hypotheticals for the VE to consider. (AR 756.) The VE was asked to consider a person limited in the same manner as described in the first hypothetical by the ALJ, but instead of occasional postural limits, the person could perform no pushing, pulling, kneeling, bending, stooping and would need to avoid temperature extremes. (AR 756.) The ALJ testified that such a person would not be able to perform the work of a bakery worker or an usher. (AR 756.)

The VE was then asked to consider a hypothetical person who could perform light exertional work, but was precluded in both upper extremities from grasping, turning and twisting,

all fingering and feeling, or reaching – including overhead reaching. (AR 756.) The VE testified there would be no jobs that such a person could perform. (AR 756.)

The VE was next asked to consider a hypothetical person of Plaintiff's age, education, and work background who could sit a total of four hours over the course of an eight-hour day; stand and walk one hour over the course of an eight-hour day; was limited to occasional lifting or carrying of no more than five pounds; and is incapable of tolerating even low work-related stress. (AR 757.) The VE testified that such a person could perform no work.

**5. The ALJ's Decision of November 16, 2010**

On November 16, 2010, the ALJ issued a decision, finding Plaintiff not disabled. (AR 656-68.) Specifically, the ALJ found that Plaintiff (1) last met the insured status requirements of the Act on December 31, 2007; (2) had not engaged in substantial gainful activity since the alleged onset date of disability through his date of last insured; (3) has the following severe impairment or a combination of impairments: status post-transient ischemic attack, cervical degenerative disc disease, torn meniscus in the right knee, and possible chronic ACL sprain; (4) does not have an impairment or combination of impairments that meets or equals one of the impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1; (5) is unable to perform his past relevant work; and (5) could perform other jobs in significant numbers in the national economy. (AR 656-68.)

The ALJ determined that Plaintiff has the residual functional capacity ("RFC") to perform light work; sitting, standing or walking six hours in an eight-hour workday; occasionally push or pull with his right upper extremities and his right lower extremities; occasionally kneel, crouch, crawl, or climb ladders ropes or scaffolds; frequently balance, stoop or climb ramps or stairs; and occasionally work overhead. (AR 659.)

Plaintiff sought review of this decision before the Appeals Council. (AR 652.) On March 13, 2012, the Appeals Council denied review. (AR 640-42.) Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. § 404.981.

## SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599,

601 (9th Cir. 1999). In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. See *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec*., 528 F.3d 1194, 1198 (9th Cir. 2008). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

**APPLICABLE LAW**

An individual is considered disabled for purposes of disability benefits if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003). The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability. In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity.

20 C.F.R. §§ 404.1520(b), 416.920(b). If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities. *Id*. §§ 404.1520(c), 416.920(c). If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1. *Id*. §§ 404.1520(d), 416.920(d). If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various limitations to perform her past work. *Id*. §§ 404.1520(f), 416.920(f). If not, in the Fifth Step, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy. *Id*. §§ 404.1520(g), 416.920(g). If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

**DISCUSSION**

Plaintiff asserts he experiences constant pain for which he takes 8 to 10 different kinds of pain medication. (Doc. 29.) He is unable to walk or stand on his own 80 to 90 percent of the time; he has difficulty using the restroom and bathing because of the failure of his extremities. (Doc. 29.) He has problems with his weight stemming from an inability to get physical exercise due to pain. His wife is also disabled, and it is very difficult for her to assist him. (Doc. 29.) There was a time when he was at the emergency room every day and he was in hospice care immediately following a corrective surgery in June and July of 2011. (Doc. 29.) Plaintiff's brief, however, does not present any argument specifying how the ALJ erred in addressing his claim. While Plaintiff states that he is confused as to why the Social Security Administration refuses to grant him the benefits that he feels he is owed, Plaintiff does not make a specific assertion of error.

The Commissioner contends the only issue on appeal is whether Plaintiff became disabled on or before his last date of insured, which is December 31, 2007, and that Plaintiff's current level of functioning is not relevant to establishing disability prior to December 31, 2007. Further, the Commissioner asserts the ALJ's decision denying Plaintiff DIB benefits is supported by

substantial evidence and should be affirmed.

**A. Plaintiff's Current Condition**

Plaintiff's brief indicates that he is currently unable to walk, he is unable to stand on his own 80 to 90 percent of the time, and he has difficulties using the restroom and bathing because of the failure in his extremities due to his illness. (Doc. 29.) Plaintiff also notes that he recently had exploratory heart surgery, and he had corrective surgery in "June/July of 2011." (Doc. 29.)

While the Court is not unsympathetic to Plaintiff's current condition, for purposes of this appeal and Plaintiff's claim for DIB, Plaintiff's last date of insured was December 31, 2007. To qualify for DIB, Plaintiff must establish that he was disabled *before* his date last insured. 20 C.F.R. § 404.131; *Morgan v. Sullivan*, 945 F.2d 1079, 1080 (9th Cir. 1991). Thus, the question for purposes of this appeal is whether the record indicates Plaintiff was disabled on or before December 31, 2007. Whatever the extent of Plaintiff's current impairments or conditions, this is not evidence that establishes his disability prior to December 31, 2007.

**B. The ALJ's Credibility Determination**

Plaintiff makes no legal argument that the ALJ improperly considered his lay statements. The Court reviews the sufficiency of the ALJ's credibility finding to determine whether substantial evidence supports the decision.

**1. Legal Standard**

In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ must engage in a two-step analysis. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged. *Id.* The claimant is not required to show that her impairment "could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036). If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if he gives "specific, clear and convincing reasons" for the rejection. *Id.* As the Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

*Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (citations and internal quotation marks omitted); *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226-27 (9th Cir. 2009); 20 C.F.R. §§ 404.1529, 416.929. Other factors the ALJ may consider include a claimant's work record and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains. *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

**2. Discussion**

The ALJ found Plaintiff not fully credible because the medical evidence did not support the degree of his subjective complaints. For example, none of the physicians of record classified Plaintiff as totally incapable of working on or before the date of last insured. They also did not advise him against substantial gainful activity. The ALJ noted Plaintiff's acknowledgment that his doctors limited his lifting to no more than 20 pounds, but that his lifting was not further restricted. That restriction matches the ALJ's RFC assessment limiting Plaintiff to only occasionally lifting and carrying up to 20 pounds. (AR 659.) The ALJ also discussed that Plaintiff reported to Dr. Damania that he required a cane to walk, but he forgot the cane on the date of his examination, and he was able to walk without it. (AR 660.) While a lack of medical evidence to substantiate a claimant's subjective testimony regarding pain and limitation cannot provide the only basis to reject a claimant's testimony, the absence of medical evidence to support subjective testimony is a factor that an ALJ can consider in discrediting symptom and limitation testimony. *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (while medical evidence alone cannot discredit testimony as to pain, it is one factor which the ALJ is permitted to consider). In combination with the reasons discussed below, the lack of corroborating medical evidence was a valid consideration in assessing Plaintiff's credibility.

The ALJ also discussed that Plaintiff was referred to physical therapy for cervical stenosis,

but was seen for initial evaluation and one follow-up appointment only. (AR 661.) He failed to attend his other follow-up appointments, and he was discharged from physical therapy on November 12, 2007, due to nonattendance. (AR 661.) A claimant's failure to pursue treatment recommendations is a permissible reason to discount subjective pain and limitation testimony. *Tommasetti*, 533 F.3d at 1039 (claimant's failure to pursue aggressive conservative treatment is a valid reason to discount credibility).

Further, the ALJ noted that Plaintiff's alleged functional limitations were out of proportion with his own description of his activities and lifestyle. (AR 662.) For example, Plaintiff stated that he performed normal chores around the house, which the ALJ found was in conflict with his allegations of disabling pain and limitation. (*See* AR 510, 753.) The ALJ also considered Plaintiff's statement to his doctors that he had helped move a washer/dryer on the morning of November 29, 2003, before he was admitted to the hospital for a near syncopal episode. (AR 319, 660.) The ALJ reasoned that, when Plaintiff restricted himself to a light level of exertion with associated nonexertional limitations, then his overall symptomatology appeared controllable and within tolerable limits. An inconsistency between the level of activity reported by a claimant and the claimant's alleged limitations is a factor that bears on credibility. *See Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). Plaintiff's statements regarding his ability to perform normal household chores and statements Plaintiff made regarding physical activity he had performed were inconsistent with the extent of Plaintiff's subjective complaints.

The ALJ also found that Plaintiff's hearing testimony was vague, which impacted his level of credibility. (AR 659.) A finding that a claimant gave vague testimony is a valid reason to discount credibility. *Tommasetti*, 533 F.3d at 1040 (ALJ's finding that claimant was a "vague witness" was a valid reason to reject subjective testimony).

In sum, the ALJ provided several legally sufficient reasons for discounting Plaintiff's credibility.

**B. The ALJ's Consideration of the Medical Evidence**

There were several conflicting medical opinions regarding the extent of Plaintiff's functional abilities. Although Plaintiff makes no legal argument that the ALJ improperly weighed

the medical evidence, the Court considers whether the ALJ's findings are supported by substantial evidence.

The ALJ gave little weight to the opinion of Dr. Kermani who indicated Plaintiff had limitations that would preclude him from substantial gainful activity. (AR 662.) Dr. Kermani was a treating physician whose opinion was controverted by other examining and non-examining physicians. As such, the ALJ was required to give specific and legitimate reasons supported by substantial evidence to discredit Dr. Kermani's opinion. *See, e.g., Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) ("A treating physician's opinion on disability, even if controverted, can be rejected only with specific and legitimate reasons supported by substantial evidence in the record.").

The ALJ noted Dr. Kermani's very restrictive assessment opinion was not supported or stated in Dr. Kermani's treating notes, and the questionnaire completed by Dr. Kermani appeared more heavily based on Plaintiff's subjective allegations, which were deemed not credible by the ALJ. (AR 662.) An ALJ may reject a treating physician's opinion that is inconsistent with the treating physician's treatment notes. *See* 20 C.F.R. §§ 404.1527(d)(4) (the more consistent an opinion is with the record as a whole, the more weight it will be given); *see also Morgan v. Comm'r Soc. Sec. Admin.*, 169 F.3d 595, 602-03 (9th Cir. 1999) (a medical report's inconsistency with the overall record constitutes a legitimate reason for discounting the opinion). The questionnaire completed by Dr. Kermani did not provide a discussion as to how the objective medical evidence supported the extent of the limitations she opined. While the form Dr. Kermani completed states it is based on MRI scans and x-rays of Plaintiff's knee and spine, there was no discussion how this objective evidence supported the *degree* of limitation opined. As such, it was reasonable for the ALJ to infer that the report was based more heavily on Plaintiff's subjective reports of his limitations, which the ALJ discredited. *See Bray*, 554 F.3d at 1227 (reasonable to discount physician's opinion that is based on claimant's subjective complaints found to be not credible).

Moreover, the ALJ noted Dr. Jensen testified there was no objective medical evidence supporting the extent of the limitations opined by Dr. Kermani. (AR 743-44.) The opinion of a

non-examining physician may constitute substantial evidence justifying the rejection of a treating physician's opinion so long as it is consistent with other evidence in the record and supported by it. *Morgan*, 169 F.3d at 602. Dr. Jensen's opinion was supported by Dr. Damania's opinion with regard to Plaintiff's exertional limitations. Dr. Damania opined Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently. (AR 514.) Further, Dr. Wong opined Plaintiff could perform light-level exertional work, standing and/or walking or sitting a total of six hours each, with the ability to occasionally push or pull with the right upper extremity and right lower extremity. Thus, Dr. Jensen's opinion regarding Plaintiff's functional abilities was supported by other evidence in the record and consistent with it. Finally, the ALJ noted Dr. Jensen is Board certified in orthopedics, which entitles his opinion to more weight. 20 C.F.R. § 404.1527(d)(5); *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012).

The ALJ's RFC assessment is also based on consideration of the objective medical evidence, which the ALJ discussed at length. (AR 660-62.) Although Plaintiff suffered a TIA on November 29, 2003, subsequent Halter monitor readings showed a normal sinus rhythm and no significant arrhythmia. A magnetic resonance angiogram ("MRA") showed stenosis or occlusion of the AI segment of the right anterior cerebral artery, but no aneurysm was found. A CT scan of Plaintiff's head was normal (AR 287, 419), and only outpatient physical and occupational therapy were recommended (AR 314).

The ALJ discussed that two-and-a-half months after Plaintiff's hospitalization, his gait was noted to be unremarkable, and he was ambulatory. Plaintiff's knee is impaired by a torn meniscus and probable ACL sprain, but a February 13, 2008, report indicated that Plaintiff's pain was controlled by medication. Further, Dr. Damania noted in December 2006 that Plaintiff had a normal range of motion in both his knees, despite some swelling and mild tenderness. Finally, while Plaintiff has a diagnosis of degenerative disc disease in his cervical spine, there was no evidence of radiculopathy and Plaintiff had failed to follow through with the recommended physical therapy for his cervical stenosis.

Considering the record as a whole, the ALJ's RFC is supported by substantial evidence both in terms of objective medical evidence as well as opinion evidence regarding Plaintiff's

functioning. As such, the ALJ's decision is legally sufficient and should be affirmed. *Hoffman v. Heckler*, 785 F.2d 1423, 1425 (9th Cir. 1986) (district court must uphold the Commissioner's non-disability determination if the proper legal standard was applied and there is substantial evidence in the record as a whole to support the decision).

**CONCLUSION AND RECOMMENDATION**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence and therefore RECOMMENDS that the ALJ's decision be AFFIRMED and judgment be entered for Carolyn W. Colvin, Acting Commissioner of Social Security.

These findings and recommendations are submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304. Within fourteen (14) days of service of this recommendation, any party may file written objections to these findings and recommendations with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the district judge's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: **February 15, 2014**

**/s/ Sheila K. Oberto**
UNITED STATES MAGISTRATE JUDGE